The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR16-300-RSL |
| Plaintiff, | |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| AUBREY TAYLOR, | |
| Defendant. | |

The United States of America, by and through Brian T. Moran, United States Attorney for the Western District of Washington, and Catherine L. Crisham and Rebecca S. Cohen, Assistant United States Attorneys for said District, hereby files this Sentencing Memorandum in the above-captioned case.   Sentencing is scheduled for Tuesday, May 21, 2019, at 10:00 a.m.

The United States asks this Court to impose a term of imprisonment of 292 months, to be followed by twenty-five years of supervised release.

## INTRODUCTION

For most of his adult life, Defendant Aubrey Taylor earned his living not through legitimate employment, but by using violence, sexual assaults, and emotional coercion to manipulate vulnerable young women into having sex with strangers and giving their earnings to him.   Taylor preyed upon teenagers and young women who were lonely, insecure, addicted to drugs, or had run away from home – fully aware that these

vulnerabilities made his victims even more susceptible to his toxic combination of physical, emotional, and sexual abuse.   Every time one of his victims would try to escape his grasp, Taylor reeled her back by plying her with false promises of a monogamous relationship, easy access to drugs, or claims that he would stop being violent in order to convince her to continue earning money for him through prostitution.  Even now, after having been convicted of five sex trafficking crimes, Taylor exhibits absolutely no remorse for his actions or how they harmed his victims.  Instead, he has blamed everyone else – the prosecution, the witnesses, and even his own attorneys – for his current legal situation and has refused to acknowledge any wrongdoing whatsoever.   The government submits that a sentence of 292 months is necessary and appropriate in light of the extent and seriousness of Taylor's crimes; the long-lasting effects that his actions will have on his victims and their families; his utter lack of remorse; and the need to protect the public.

## FACTUAL BACKGROUND

On March 6, 2019, after an eight day trial, a jury found Taylor guilty of one count of Conspiracy to Engage in Sex Trafficking of a Minor (victim H.S.), in violation of 18 U.S.C. §1591(a)(1) and (c) and 1594(c) (Count One); one count of Sex Trafficking of a Minor and through Force, Fraud, or Coercion (victim H.S.), in violation of 18 U.S.C. §1591(a)(1), (b)(1), (b)(2), and (c) (Count Two); and three counts of Sex Trafficking through Force, Fraud, and Coercion (victims A.M., D.K., and L.C.), in violation of 18 U.S.C. §1591(a)(1) and (b)(1).

The government adopts the statement of facts set forth in the Presentence Report.  Additionally, the government relies upon the testimony and evidence offered at trial in this matter, with which this Court is familiar.  In summary, this testimony and evidence demonstrated that for years, Taylor spent the majority of his time recruiting vulnerable young women to work for him as prostitutes and directing them to travel to cities throughout Washington State to earn money for him by selling their bodies.  Taylor collected all of the money his victims earned, requiring them to account for every dollar spent on hotel rooms, online advertisements, and condoms.  He controlled every aspect of

GOVERNMENT'S SENTENCING MEMORANDUM - 2
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

his victims' lives – telling them where to go, how many prostitution dates they had to do each day, and even how late they could sleep in the morning.  He used whatever means necessary to ensure that his victims engaged in prostitution for his benefit – drugs, physical violence, rape, and false declarations of love and commitment – and took their earnings to subsidize his regular purchases of clothes, athletic shoes, marijuana, alcohol, trips to Las Vegas, and even a Mercedes.

In light of the thoroughness of the Presentence Report, and the Court's familiarity with the facts of this case as a result of having presided over the trial, the government will not reiterate in great detail all of the evidence adduced during the course of trial.  Instead, the government will briefly discuss the specific crimes Taylor perpetrated against each of the four victims who bravely testified during the course of this prosecution.

### 1.       H.S. (Counts One and Two)

H.S. was a sheltered, home-schooled teenager from rural Montana who began acting out and running away when her family moved to the Seattle suburbs her sophomore year of high school.  In October 2014, H.S. was hanging around in downtown Seattle when she was approached by Taylor's brother Carl ("Carl"). Text messages retrieved from Taylor's cell phone showed that Taylor was attempting to teach Carl the ways of the prostitution business, and Carl began grooming H.S. by telling her she was beautiful and renting a hotel room for them to spend time in together.  One of the first nights they spent together, Carl sexually assaulted H.S.  H.S. testified that even though this assault traumatized her, she continued to spend time with Carl because she felt like she had no one else to turn to and wanted to believe that Carl was a good person.

On October 19, 2014, H.S. ran away from her group home.  She told Carl that she had run away and that there was a warrant for her arrest.  Carl rented a hotel room for her, and told her that he was sending her with Taylor to Wenatchee to make money.

The next afternoon, Carl and H.S. met up with Taylor and Taylor's girlfriend, A.M., at a park in Seattle.  After Carl introduced her to Taylor and A.M., he told H.S. to get in the car with them.  During the car trip, while A.M. was driving the car, Taylor went

GOVERNMENT'S SENTENCING MEMORANDUM - 3
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

into the back seat and told H.S. to perform oral sex on him.  H.S. repeatedly told Taylor she did not want to do this, at which point Taylor grabbed H.S.'s head and forced her to do it. By forcing H.S. to perform oral sex on him against her will, Taylor showed H.S. that he had complete power and control over her.  The assault established the power dynamic going forward, and H.S. believed that she had no choice but to do what Taylor told her to do.

When they arrived in Wenatchee, Taylor directed A.M. to rent a room for her and H.S. at the Best Western and a separate room for Taylor at the Super 8, so that Taylor would not be in the same hotel if A.M. or H.S. were encountered by law enforcement.  At Taylor's direction, A.M. and another victim, T.T., arranged for prostitution advertisements to be posted for H.S. on Backpage.com.  A.M. told H.S. that Taylor had certain rules she had to follow, including always wearing a condom, counting the money from customers up front, and not having "dates" with black men.  A.M. also told H.S. what to do with the customers and how much money to charge them.  After the prostitution "dates," H.S. was required to immediately give her earnings to either Taylor, if he was there, or A.M., who would then give it to Taylor.

H.S. estimated performing sex acts in exchange for money with between fifteen and twenty male clients, including many back-to-back dates in which there was no break between customers.  Indeed, A.M. testified that she kept the names and contact information of H.S.'s information in her cell phone, and investigators located 25 different entries in A.M.'s phone associated with H.S.'s online name "Lydia."  H.S. testified that she often went two days without sleep, and did not eat for an entire day on several occasions due to the volume of customers.  H.S. did not get to keep any of the money she earned from commercial sex acts but was required to give all of her earnings to Taylor or A.M.

H.S. testified that she told both Taylor and A.M. that she was a runaway minor with a warrant for her arrest.  After law enforcement came to the Best Western one evening, Taylor decided that it was too dangerous to continue to stay there with H.S.  He

instructed A.M. to drive them to Kennewick, where A.M. did a prostitution date.  While in Kennewick, Taylor once again sexually assaulted H.S.  He first told H.S. and A.M. to perform oral sex on him simultaneously and then, when A.M. left the room, Taylor forced H.S. to have vaginal sex.  H.S.'s lingering trauma from these assaults, and the re-traumatization that was triggered as a result of her having to relive them in a courtroom of strangers, was evident at trial.

After one night in Kennewick, Taylor directed A.M. to drive back to Seattle.  He dropped H.S. off with Carl, and gave him his percentage of the money H.S. earned.  Within a few days, Taylor instructed A.M. to go back to Wenatchee to earn money through prostitution, and A.M. advised him that she was going to take H.S. as well.  H.S. testified that with A.M. supervising her, she met with additional prostitution customers during this second trip and gave all her money to A.M.  After H.S. sent text messages to a friend and family member explaining that she was in a dangerous situation and being held against her will, law enforcement recovered H.S. at the LaQuinta Inn in Wenatchee.  Although she initially denied being trafficked, she eventually disclosed to law enforcement the crimes that Taylor had committed against her.

### 2.    A.M. (Count Three)

A.M. met Taylor in August 2011 after he asked for her number when they were parked next to each other at a stoplight.  Although A.M. had many things going for her – she had career goals and a job she loved at a pet hospital – she lacked self-confidence and fell easily for Taylor's manipulations.  She began dating him, even though Taylor also had a live-in girlfriend.  In October 2011, after learning that A.M.'s grandmother had given her a large loan to pay off her credit card debt, Taylor convinced A.M. to lend him $5,000.  He subsequently told her that the money had been "stolen" and that the only way to earn the money back was through prostitution.  A.M., who felt like she had breached her grandmother's trust, began posting prostitution advertisements on Backpage.com and giving her earnings to Taylor.

GOVERNMENT'S SENTENCING MEMORANDUM - 5
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Taylor trafficked A.M. for over four years, collecting the tens of thousands of dollars that she earned from having sex with strangers. Taylor used a combination of methods to maintain control over A.M. He initially coerced her through false promises of a committed relationship, but soon moved on to emotional and verbal abuse, guilt trips, and brutal, constant beatings that sent her to the hospital and destroyed her sense of self. Taylor's control over A.M. was so strong that he was able to manipulate her into being his "bottom girl" and supervising his other victims. Taylor directed A.M. to post advertisements for other women, drive them out of town and to dates, and collect the money they earned. Taylor did not let A.M. keep any of the money she or the other women earned, but instead insulted her, belittled her, and physically abused her whenever he became annoyed by her or thought she was not making enough money. Even when A.M. finally developed the strength to leave Taylor, he continued to send her threatening text messages telling that she owed him money for learning his "recipe" of prostitution. After Taylor was arrested in connection with this matter, he attempted to make A.M. take the fall for his crimes, telling law enforcement that she and Carl were responsible for trafficking H.S.

### 3.    D.K. (Count Four)

In May 2015, D.K. was living in Seattle with her young son when Taylor contacted D.K. through social media and suggested they get together. D.K. knew of Taylor because he previously had attempted to recruit her from her Backpage.com advertisement. By the time Taylor had reached out to her again, D.K. had stopped working as a prostitute and was one test away from receiving her GED.

Taylor and D.K. began dating, and she shared with him that she was having financial difficulties. Taylor convinced D.K. not to take the GED test but instead to work for him as a prostitute. He promised her that they would be in a monogamous relationship and would buy a house together. Taylor told D.K. that he could manage her money, and that she could stop prostituting once she had earned $100,000. D.K. felt she had no other choice to earn money, and believed Taylor's false promises of a home and family.

1   Taylor posted advertisements for D.K. on Backpage.com and communicated with
2   the customers via text message and negotiated prices and details.   He directed her to rent
3   hotel rooms in her name so that he would not be connected if she was contacted by law
4   enforcement.   Taylor took all of the money that D.K. earned through prostitution.  He told
5   her that there was no need for her to have cash on hand, and that he would give her money
6   if she needed it.  On some occasions, Taylor turned down D.K.'s requests for money.
7   Taylor told D.K. she had to work every day, and many times told her to keep working
8   even if she was sick.  On average, D.K. made $600 per day, all of which she gave to
9   Taylor.  Taylor spent this money on himself.

10   Taylor often chastised D.K. for not making enough money, and talked about prior
11   victims who had earned much more money for him.  He also had rules D.K. had to follow,
12   including that she could not do prostitution dates with any black men, because he thought
13   they might try to recruit D.K. away from him. Taylor also took D.K. out of town to
14   prostitute on several occasions, including to Wenatchee and Las Vegas.  He was verbally
15   and emotionally abusive to D.K., telling her that she was a "whore" and telling her that
16   she needed to give up custody of her son to be with him.

17   Although Taylor initially coerced D.K. into working for him through false promises
18   of a committed relationship, what he ultimately used to compel her prostitution was
19   physical force in the form of threats and beatings.  Throughout the entire time D.K. was
20   with Taylor, he engaged in a continuous course of conduct designed to keep her in fear of
21   what would happen if she refused to work for her as a prostitute. D.K. testified that Taylor
22   beat her multiple times per week.  On one occasion, Taylor began beat D.K. in front of her
23   son and slammed her into a wooden armrest so hard that she still feels pain in her back
24   together.  On another, he brandished a firearm at her.  In October 2015, he choked her so
25   hard she almost lost consciousness and destroyed her apartment, shattering her sliding
26   glass door.  Although law enforcement filed charges against Taylor after this assault, he
27   successfully manipulated D.K. into recanting her statement and charges were dropped.

28

GOVERNMENT'S SENTENCING MEMORANDUM - 7
*United States v. Taylor*, CR16-300 RSL

### 4.     L.C. (Count Five)

L.C. met Taylor when she was 12 and he began dating her older sister.  L.C. was aware that Taylor was physically abusive towards her sister, and had used her to help him traffic drugs between Washington and Nebraska.  Taylor was ultimately convicted of conspiracy to distribute cocaine base in the United States District Court for the District of Nebraska and sentenced to 46 months custody.

After serving his federal sentence, Taylor returned to the Seattle area and earned his living through sex trafficking and selling drugs.  Taylor was aware through L.C.'s sister that L.C. had developed an addiction to prescription pills and heroin.   He was a regular supplier of pills to L.C.'s friend K.N., and subsequently convinced K.N. to work for him as a prostitute in exchange for pills.  Taylor also tried to recruit L.C. to work for him, but she declined.

By 2012, L.C.'s drug addiction had gotten worse and she was in a dangerous living situation.  Thinking there was no one else she could rely on, L.C. contacted Taylor and told she needed to leave her situation and "make money."  Taylor and A.M. picked up L.C. at the house where she was staying and took her to a Howard Johnson in Kent. Taylor instructed L.C. that A.M. would take her to the hotel and post an advertisement for her on Backpage.  He told L.C. to give A.M. half the money she earned before A.M. left for work the next morning.  A.M. posted an advertisement for L.C. on Backpage, and she did one date that evening.  After meeting with one customer, L.C. decided that she wasn't ready to prostitute.  She gave Taylor approximately half her earnings, and then left the hotel room.  Taylor was angry with the amount of money she had earned because it had not covered the hotel room, and told her that she owed him money.  Taylor then began sending L.C. harassing text messages, telling her that if she set up a date with anyone who called her from the Backpage advertisement A.M. had placed, she would owe him any money she earned because this was his client.

For the next year, L.C. was in sporadic contact with Taylor via text and Facebook. In these messages, Taylor encouraged L.C. to come back and work for him as a prostitute.

By 2014, L.C. was again in a bad living situation with a violent pimp and still addicted to heroin.  She contacted Taylor and asked if he could come get her.  Taylor picked up L.C. and took her to an apartment in Kent that he was sharing with A.M. and T.T.   Taylor told L.C. that if she worked for him as a prostitute, he would provide her with heroin every day.  L.C. testified that at this point, she was very addicted to heroin and would get physically dope sick if she did not have heroin every day.

L.C. worked for Taylor as a prostitute, off and on, for approximately two years. During the entire time she worked for him, Taylor would instruct A.M. to post Backpage advertisements for L.C.  After L.C. conducted a certain number of prostitution "dates," Taylor then provided her with a daily dose of heroin or, on some occasions, instructed A.M. or T.T. to provide it to L.C.  If Taylor was not happy with the amount of money L.C. had earned, he would tell her that she needed to do a date before he would give her drugs. Taylor would then withhold the drugs until L.C. provided him with more money.  L.C. was not allowed to hold her own money; rather, if she wanted to buy cigarettes or get something to eat, Taylor would tell her to do a few more dates and then would instruct A.M. to purchase what L.C. needed.  L.C. eventually left Taylor, but still struggles with drug addiction.

## PRESENTENCE REPORT AND ADVISORY GUIDELINES RANGE

The draft Presentence Report provided to the government by the Probation Office accurately summarizes the offense conduct in this case, as well as the Defendant's criminal history category.  The government respectfully submits that the total offense level, and resulting advisory Guidelines range, should be calculated as follows:

**1.      Counts One and Two (Sex Trafficking of H.S. as a Minor and through Force, Fraud, and Coercion)**

The government agrees with the Probation Office that the correct base offense level for Count Two is 34, pursuant to Section 2G1.3(a)(3)(1) of the United States Sentencing

GOVERNMENT'S SENTENCING MEMORANDUM - 9
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Guideline (USSG).[1]  The government also believes that the following enhancements should be applied with respect to this count:

      **a.**      **Undue Influence of Minor**.  The government agrees with the Probation Office that a two-level increase, pursuant to USSG Section 2G1.3(b)(2)(B), should be applied because Taylor "unduly influenced a minor to engage in prohibited sexual conduct."  The commentary to Section 2G1.3 states that in a case, such as this one, "where a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that [this] subsection applies.  In such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor."  Here, Taylor was twenty-eight when he trafficked H.S.  This enormous age difference, on its own, is sufficient to establish Taylor unduly influenced H.S. to engage in prohibited sexual conduct.  Furthermore, the evidence at trial made clear that Taylor "unduly influenced" H.S. to engage in prostitution.  Within hours of meeting her, Taylor forced her to perform oral sex on him in a moving car, despite her repeated statements that she did not want to do so.  He also took her to a city where she had never been and knew no one, knowing that she was a runaway on warrant status with no money of her own.  Taylor was fully aware that these circumstances made H.S. feel as if she had no choice but to accede to his instructions that she earn money through prostitution.  This evidence more than demonstrates that Taylor "unduly influenced" H.S. to engage in prostitution.  Accordingly, the two-level increase is appropriate.

      **b.**      **Use of a Computer.**  The government agrees with the Probation Office that the Court should impose a two-level increase, pursuant to USSG Section 2G1.3(b)(3)(B), because the crimes involved the use of a computer to "persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct" and to "entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct

---

[1] The government also agrees that pursuant to USSG Section 3D1.2, Application Note 4, the conspiracy count in Count One is grouped together with the underlying offense in Count Two and thus does not impact the guideline scoring.

GOVERNMENT'S SENTENCING MEMORANDUM - 10
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with a minor." A.M. testified that Taylor directed her and T.T. to post prostitution advertisements of H.S. on Backpage.com. The men who ultimately paid to have sex with H.S. arranged the meeting after seeing the advertisement on the computer. Such conduct clearly involves the "use of a computer" to "entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with" minor H.S. to engage in commercial sex acts and the enhancement should be applied.

       **c.**    **Commission of a Sexual Act.** The government respectfully submits that a two-level increase, pursuant to USSG Section 2G1.3(b)(4)(A), should be applied, because the offense involved the commission of a sexual act – namely, the multiple commercial sex acts that H.S. was forced to participate in by the Defendant, as well as his forced oral and vaginal sexual assaults.

       **d.**    **Victim Related Adjustment.** The government agrees with the Probation Office that a two-level increase, pursuant to USSG Section 3A1.1(b)(1), should be applied here. Taylor was aware, both through Carl and H.S. herself, that H.S. was a runaway on warrant status and had no money or access to transportation. He took her to a new city, where she did not know anyone and was afraid of turning to law enforcement. Taylor was aware of H.S.'s vulnerabilities and exploited them in order to use her body to earn money for his own needs. The two-level adjustment should be applied.

       **e.**    **Role in the Offense.** The government agrees with the Probation Office that a two-level enhancement, pursuant to USSG Section 3B1.3(c), should be applied because Taylor was an organizer, leader, manager, or supervisor in a criminal activity. The Commentary to the Guidelines states: "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 app. n. 2. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n.1.

       In this case, Taylor directed both A.M. and T.T. to further his prostitution business with respect to H.S. Specifically, Taylor instructed A.M. to rent a hotel room in her name,

purchase condoms, explain the "rules" of prostitution, ensure that H.S. was engaging in prostitution, and collect all the money she earned.  He also instructed T.T. to place prostitution advertisements for H.S. on Backpage.com.  The fact that A.M. and T.T. were also Taylor's victims does not mean that they did not also "participate," at Taylor's direction, in H.S.'s trafficking.  Indeed, contrary to the defense's position, appellate courts have recognized that a trafficking victim who nevertheless assists a trafficker with respect to other victims may be considered a "participant" for purposes of Section 3B1.3(c).  *See, e.g., United States v. Smith*, 719 F.3d 1120, 1126 (9th Cir. 2013) (affirming imposition of two-level enhancement under Section 3B1.1(c) where there was "ample evidence" that defendant assigned his "'bottom bitch' to groom [another victim] for her prostitution responsibilities and that [she] undertook a number of steps in doing so;" it was "immaterial" that the bottom "did not herself commit the same underlying offense as [the defendant], so long as she was a knowing accessory to his crime"); *United States v. Jackson*, 865 F.3d 946 (7th Cir. 2017) (noting that other courts have concluded that a victim may be considered a "participant" if she "coerces or transports or otherwise oversees other victims").  In this case, the evidence at trial made clear that A.M. and T.T. participated in H.S.'s trafficking by posting advertisements (in T.T.'s case) and overseeing, coaching, and supervising her (in A.M.'s case).  Indeed, the involvement of A.M. and T.T. alone make the two-level adjustment proper.

In addition, the involvement of Taylor's brother Carl in H.S.'s trafficking further supports the imposition of the adjustment here.  Text messages recovered from Taylor's phone showed that he was attempting to encourage his brother to enter the prostitution business and bragged to him how much money he made taking A.M. to Wenatchee.  The evidence also showed that Carl groomed H.S. and then passed her off to his more experienced brother to initiate her into prostitution.  Indeed, Taylor admitted in a text message that while he was going to keep half the "hoe money" H.S. earned, he would also give a portion to his brother Carl for successfully "knock[ing]" (i.e., recruiting) H.S. and giving Taylor the opportunity to "turn her into a real go-getter."  Because Taylor was

GOVERNMENT'S SENTENCING MEMORANDUM - 12
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

clearly the "leader" and "organizer" in a criminal conspiracy that involved at least A.M., T.T. and Carl, the adjustment should be applied.

Applying these enhancements, the adjusted base offense level for Counts One and Two is 44.

### 2.   Count Three (Sex Trafficking of A.M. through Force, Fraud, and Coercion)

The government agrees with the Probation Office that the base offense level for Count Three is 34, pursuant to Section 2G1.1(a)(1).  The government also agrees that a two-level adjustment for role in the offense should also be applied pursuant to Section 3B1.3(c).  While it is true that A.M. cannot be a "participant" in her own trafficking, *see Jackson*, 865 F.3d at 955, the evidence adduced at trial demonstrated that Taylor was an organizer and leader in his sex trafficking activity.  As noted above, he directed T.T. to post Backpage.com advertisements of A.M. and H.S. when they were in Wenatchee in October 2014, as well as on other occasions.  He also directed that R.B., another one of his victims, accompany A.M. to Wenatchee in late October 2014 so that she could rent a hotel room so that A.M. could work as a prostitute without attracting the attention of law enforcement.  Because Taylor organized and led the prostitution enterprise through which A.M. was sexually exploited for money, the role enhancement is warranted.

Applying this enhancement, the adjusted base offense level for Count Three is 36.

### 3.   Count Four (Sex Trafficking of D.K. through Force, Fraud, and Coercion)

The government agrees with the Probation Office that the base offense level for Count Four is 34, pursuant to Section 2G1.1(a)(1).  The government further agrees that no additional adjustments should be applied with respect to D.K.

### 4.   Count Five (Sex Trafficking of L.C. through Force, Fraud, and Coercion)

The government agrees with the Probation Office that the correct base offense level for Count Five is 34, pursuant to Section 2G1.3(a)(3)(1) of the United States Sentencing

GOVERNMENT'S SENTENCING MEMORANDUM - 13
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Guideline (USSG).  The government also believes that the following enhancements should be applied with respect to this count:

**a.     Victim Related Adjustment.**  The government agrees with the Probation Office that a two-level increase, pursuant to USSG Section 3A1.1(b)(1), should be applied here.  Taylor was aware that L.C. was addicted to heroin and would have physical withdrawals if she did not have daily access to these drugs.  Taylor used L.C.'s addiction against her, first attempting to recruit her with the promise of ready access to drugs and then withholding drugs if she did not make him a certain amount of money.  On at least one occasion, Taylor withheld drugs from L.C. until she performed oral sex on him.  Taylor was well aware of L.C.'s addiction and the physical effect it had on her, and exploited this vulnerability in order to use her body to earn money for his own needs.  The two-level adjustment should be applied.

**b.     Role in the Offense.**  The government agrees with the Probation Office that a two-level enhancement, pursuant to USSG Section 3B1.3(c), should be applied because Taylor was an organizer, leader, manager, or supervisor in a criminal activity.   In this case, Taylor directed both A.M. and T.T. to supervise L.C.'s prostitution activities.  In particular, he gave both A.M. and T.T. heroin to hold onto and directed them to give some to L.C. only when she had earned a sufficient amount of money through prostitution.  He also directed A.M. and T.T. to rent hotel rooms for L.C., post online advertisements, and drive her to prostitution dates.  For all these reasons, a two-level enhancement pursuant to Section 3B1.3(c) is appropriate.

Applying this enhancement, the adjusted base offense level for Count Five is 38.

**5.     Multiple Count Adjustment**

The government agrees with the Probation Office that a two-level increase, pursuant to Section 3D1.4, is appropriate because the offense involved multiple counts of conviction involving four different victims.

**6.     Acceptance of Responsibility.**  The government agrees that Defendant does not qualify for a downward adjustment for acceptance of responsibility.  As set forth

GOVERNMENT'S SENTENCING MEMORANDUM - 14
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  in Application Note 2 to Section 3E1.1, Defendant does not qualify for this adjustment

2  because he put the government to its burden of proof at trial by denying the essential

3  factual elements of guilt.  In addition, Defendant has not expressed remorse or contrition

4  for his conduct.

5       These calculations result in a total offense level of 46. With a criminal history

6  category of IV, this results in an advisory guidelines range of life.  The mandatory

7  minimum sentence required by Counts Two through Five is 180 months.

8                    **SENTENCING RECOMMENDATION**

9       The government respectfully asks this Court to sentence Taylor to a term of

10  imprisonment of 292 months, to be followed by twenty-five years of supervised release.

11  The government recognizes that although this recommended sentence is lower than the

12  advisory Guidelines range of life imprisonment, it is nevertheless a lengthy and significant

13  sentence.  The government reached this recommendation only after considering both the

14  facts of this particular case and the sentences that have been imposed in similarly-situated

15  cases.  In light of these factors, the government submits that a 292 month sentence is

16  necessary and appropriate in light of the incredibly predatory and exploitative nature of

17  Taylor's crimes; his criminal history and longtime involvement in sex trafficking; the

18  harm his crimes have had, and will continue to have, on his victims and their families; his

19  utter lack of remorse; and the need to protect the public from Taylor's further crimes.

20       At the outset, the government notes that 18 U.S.C. § 3553(b)(2) specifically states

21  that when sentencing a defendant under Section 1591, a sentencing court "shall impose a

22  sentence of the kind, and within the range, referred to in [the advisory Sentencing

23  Guidelines] unless" the sentencing court finds that certain aggravating or mitigating

24  circumstances exist, or if the government has filed a motion acknowledging substantial

25  assistance by the defendant.  *See* 18 U.S.C. § 3553(b)(2).   The government submits that

26  only two such mitigating circumstances exist here – 1) Taylor's difficult early childhood

27  and lack of strong parental role models and 2) the fact that the longest sentence he has

28  served thus far is 46 months imprisonment – that warrant a sentence below the life

GOVERNMENT'S SENTENCING MEMORANDUM - 15
*United States v. Taylor*, CR16-300 RSL

1   imprisonment recommended by the Guidelines.   In particular, the following Section

2   3553(a) factors support the government's recommendation:

3   **A.   Nature and Circumstances of the Offense**

4         As this Court is well aware, the facts of this case are horrific and disturbing.  For

5   years, Taylor exploited numerous vulnerable individuals to satisfy his own desire of

6   control over his victims and for his own financial benefit.  Each of the victims who

7   testified at trial were vulnerable in some way to Taylor's methods of force, fraud, and

8   coercion.  A.M. is an intelligent, driven young woman who nevertheless suffered from a

9   lack of self esteem and an intense desire to be loved and in a relationship.  Taylor seized

10   upon A.M.'s emotional vulnerabilities to exploit her.  He used false promises of a

11   committed relationship to manipulate her into selling her body to earn him money, called

12   her derogatory names and insulted her sense of self-worth, and physically beat her so

13   badly that an emergency room physician who treated A.M. begged her to report Taylor to

14   law enforcement.  A.M. was too scared and emotionally connected to Taylor to do so.

15   Instead, she continued to work for Taylor both as a prostitute and as his "bottom," putting

16   herself in physical and legal risk every day while Taylor spent time watching television or

17   at the club with his friends, reaping the financial benefits of her work.

18         Taylor similarly treated D.K. as nothing more than a commodity to earn him

19   money.   Instead of encouraging her dreams of getting her GED and becoming

20   economically self-sufficient, he manipulated her into going back to working as a prostitute

21   and giving her earnings to Taylor – ostensibly for the purpose of building a future home

22   together but instead to finance Taylor's lifestyle.  Taylor forced D.K. to do multiple

23   prostitution dates nearly every single day.  He also regularly beat her multiple times per

24   week, told her she was a whore who was worth nothing, took all the money she earned,

25   and pressured her into sending her son to live with a relative so that she could have more

26   free time to work as a prostitute for him.   D.K. still bears both the physical and emotional

27   wounds she suffered at Taylor's hands, as well as the residual trauma from her forced

28

GOVERNMENT'S SENTENCING MEMORANDUM - 16
*United States v. Taylor*, CR16-300 RSL

sexual exploitation by the prostitution customers, which she described at trial as "paid rape."

Taylor's behavior towards L.C. is equally abhorrent. Although he had known her since she was a girl and claimed to treat her as a "little sister," in fact Taylor manipulated L.C.'s addiction to coerce her into prostituting and providing him with her earnings. The text messages retrieved from Taylor's cell phone make clear that he did not care one bit about L.C.'s well-being, or the fact that she was in the throes of a horrific addiction. Rather, he saw L.C. only as a vehicle for making him money and, occasionally, satisfying his sexual urges. Although Taylor did not cause L.C.'s addiction, his callous and dehumanizing treatment of her almost certainly exacerbated it.

Finally, Taylor's criminal conduct towards H.S., a sheltered, troubled juvenile runaway, warrants a significant sentence. As noted above, Taylor willingly took H.S. to a strange city in eastern Washington and sexually assaulted her on the trip there to ensure her compliance and establish his dominance. He then forced her to have sex with numerous strange men, putting her at risk of diseases and assault. He also raped her himself, both orally and vaginally, on at least one other occasion. H.S.'s testimony at trial makes clear that she is still incredibly traumatized by Taylor's crimes and the dehumanizing sexual acts she was forced to endure at his hands, and likely will deal with such trauma and guilt for a long period of time.

The seriousness of Taylor's crimes is magnified by his use of physical, mental, and emotional coercion to prey upon and control his victims. He put them in danger every day he used them – forcing them into being completely vulnerable with strange men who could arrest them or rape them. He treated them like they were nothing more than "hoes" and "bitches" who had no worth and no dignity, and whose sole purpose was to make him money. He talked derisively about them and to them and bragged in his text messages about beating them up.

The Court heard all four victims testify at trial about being trafficked by Taylor. H.S., D.K., and A.M. in particular, gave heart wrenching accounts of Taylor's exploitation

GOVERNMENT'S SENTENCING MEMORANDUM - 17
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of them.  As a result of their victimization by Taylor, all four victims have suffered

significant trauma – trauma that they were forced to revisit during their testimony at trial.

A significant sentence of 292 months is necessary to account for the severity and extent of

Defendant's crimes, and how they have negatively impacted his victims' lives.

**B.   Defendant's Personal History and Characteristics**

Taylor's background and criminal history further justifies the government's

recommended sentence.  The Presentence Report makes clear that Taylor's parents failed

to be positive role models for him, and that he first learned the basics of the prostitution

and drug trafficking industries from them.  There is no doubt that Taylor's troubled early

childhood, and their own involvement in criminal activity, had a negative impact upon and

likely contributed to his violence and lack of respect towards women.

Nevertheless, unlike many defendants who appear before this Court, Taylor did

have the benefit of having been raised between the ages of five and fourteen in a stable

home with his loving grandmother.  Taylor's own actions ultimately led to him being

kicked out of his grandmother's house after he dropped out of school and began smoking

marijuana.  Soon thereafter, Taylor became involved in a gang lifestyle and entered into

the world of drug trafficking with his father.  Although Taylor undoubtedly faced

significant challenges as a result of his childhood, he bears ultimate responsibility for his

conduct and the criminal actions he has engaged in as an adult.  Taylor is a violent,

manipulative, and exploitative person who has supported himself with the prostitution

profits of his victims.  Throughout his adult life, Taylor has exhibited nothing other than

utter disregard for the law and a complete lack of respect for women.  Defendant's

conduct as an adult – and the trauma and pain that conduct has inflicted on others –

weighs in favor of a significant sentence.

**C.   Need to Protect the Public**

Taylor's conduct and criminal history makes clear that he is a predatory person,

who has spent most of his adult life living off the prostitution profits of vulnerable

juveniles and young women.  Indeed, the text messages retrieved from Taylor's phone,

GOVERNMENT'S SENTENCING MEMORANDUM - 18
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and the testimony of victims A.M. and L.C., made clear that he had previously manipulated numerous other women into working for him as prostitutes and providing him with their earnings.  He also committed numerous violent physical assaults against his intimate partners, including at least three women who are the mothers of his children. Based upon his past choices, there is a strong likelihood that Taylor will revert to this type of conduct when he is released from prison.  Taylor's history suggests that he poses a very real danger to the community and that he will likely continue to sexually exploit women upon his release.   Accordingly, a significant sentence of 292 months is warranted.

The government is also especially concerned about the fact that Taylor has expressed no remorse whatsoever for the harm he has inflicted on his victims.  Rather, he continues to maintain that it was their choice to engage in prostitution and hand over their earnings to him.  Indeed, his only regret seems to be that he was not aware of the federal penalties for sex trafficking when he chose to engage in that conduct.  *See* PSR at ¶96. This attitude does not bode well for Taylor's ability to turn around his previous history and live a proactive, crime-free lifestyle, to say the least.

The government further submits that a twenty-five year term of supervised release is necessary and appropriate.  Taylor is not only a sex trafficker, but he is a sex trafficker who preys upon young, vulnerable girls and women, and uses physical and sexual violence to force them to accede to his demands.   An examination of his personal characteristics and criminal history makes clear that he knows nothing other than a lifestyle in which he preys upon women to financially support him.  While it is true that he will be a middle-aged man when he is released from prison, it seems likely that he will pose just as much of a danger to his community then as he does now.  Given the heinousness of Taylor's crimes, as well as his troubling tendency to recruit and exploit young girls and women, a significant term of supervised release is necessary to protect the community.

GOVERNMENT'S SENTENCING MEMORANDUM - 19
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**D.    The Need for Adequate Deterrence to Criminal Conduct**

The sentence in this case must be severe enough to deter Taylor and others from weighing the costs of a lenient sentence versus the benefits of using physical, emotional, and sexual abuse to coerce young women to work for them as prostitutes.  There is a strong need to deter this type of exploitation of vulnerable young women who are forced into sex trafficking.  Stiff penalties are necessary to discourage individuals from using emotional and physical coercion to force and manipulate women into sexual slavery.  A sentence of 292 months will serve this goal.  Citizens of this district are entitled to know that individuals who exploit vulnerable teenage girls and young women, and manipulate them into working as prostitutes, will suffer consequences commensurate with their conduct.  More importantly, the sentence must be significant enough to convince Taylor that his victimization of women will not be tolerated and that he cannot support himself through prostitution.

**E.    Need to Avoid Unwarranted Sentencing Disparities**

The government also respectfully submits that its recommended sentence of 292 months imprisonment is consistent with sentences imposed on other, similarly-situated sex trafficking defendants in this district who went to trial.  Most of those cases resulted in sentences of 20 years or more.  *See, e.g., United States v. Jerome Todd*, CR07-395-JLR (defendant who trafficked four adult woman using physical violence sentenced to 26 years imprisonment post-trial); *United States v. Juan Vianez*, CR09-5065-RJB (defendant who used violence to traffic juvenile victim and engaged in witness tampering sentenced to 20 years imprisonment and ordered to pay $1.3 million in restitution post-trial); *United States v. Alexander Walls*, CR11-5408-RJB (defendant who used violence to traffic three juveniles and one adult sentenced to 23 years imprisonment post-trial and ordered to pay $144,479.60 in restitution); *United States v. David Delay*, CR15-175-RSL (defendant who used fraud, coercion, and sexual violence to traffic three adult victims, attempted to traffic three juvenile victims, produced child pornography of two victims, and obstructed justice and tampered with witnesses sentenced to 33 years imprisonment post-trial).

GOVERNMENT'S SENTENCING MEMORANDUM - 20
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    The government further submits that two sex trafficking defendants who went to

2    trial and received terms of imprisonment of less than twenty years are not similarly

3    situated, as both of those cases involved significantly less physical and emotional violence

4    and shorter durations of trafficking than this one.  In *United States v. Robert Powell*,

5    CR15-244-RAJ, the defendant who used violence and emotional coercion to traffic one

6    adult victim for approximately one year and transported two juveniles in interstate

7    transportation for purpose of prostitution over a several week period.  Powell ultimately

8    was sentenced to 198 months in prison.  In *United States v. Nathan Bonds*, CR14-74-JCC,

9    a defendant who trafficked two juvenile victims over a several week period was sentenced

10   to 120 months imprisonment.  Notably, unlike this one, the *Bonds* case did not involve any

11   physical violence and the jury declined to find that Bonds used force, fraud, or coercion to

12   compel his juvenile victim to engage in commercial sex acts.  Given the facts of this case,

13   Taylor's personal history, and sentences imposes in similarly situated cases in this district,

14   a sentence of 292 months is appropriate.

## **RESTITUTION**

16   The government intends to seek restitution on behalf of the victims pursuant to 18

17   U.S.C. §1593(a).  Because the government is still in the process of collecting information

18   from the victims regarding the losses they incurred as a result of Taylor's crimes, the

19   government intends to ask that the issue of restitution be addressed at a separate hearing

20   no more than sixty days from the date of the sentencing. The Probation Office has no

21   objection to proceeding in this matter.

GOVERNMENT'S SENTENCING MEMORANDUM - 21
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## **CONCLUSION**

2          After considering the impact of Taylor's crimes on his victims and their families,

3   his lack of remorse, and the remarkable danger Taylor poses and will always pose to

4   vulnerable members of the public, the government respectfully asks this Court to impose a

5   sentence of 292 months, to be followed by a twenty-five years of supervised release.

6          DATED this 14th day of May, 2019.

7

8                                                    BRIAN T. MORAN
                                                     United States Attorney
9

10                                                   */s/ Catherine L. Crisham*
                                                     CATHERINE L. CRISHAM
11                                                   Assistant United States Attorney
                                                     700 Stewart Street, Suite 5220
12                                                   Seattle, Washington  98101
                                                     Phone: 206-553-8451
13                                                   Fax:     206-553-0755
14                                                   E-mail: catherine.crisham@usdoj.gov

15

16                                                   */s/ Rebecca S. Cohen*
                                                     REBECCA S. COHEN
17                                                   Assistant United States Attorney
                                                     700 Stewart Street, Suite 5220
18                                                   Seattle, Washington  98101
                                                     Phone: 206-553-526
19                                                   Fax:     206-553-0755
20                                                   E-mail: becca.cohen@usdoj.gov
21

22

23

24

25

26

27

28

GOVERNMENT'S SENTENCING MEMORANDUM - 22
*United States v. Taylor*, CR16-300 RSL

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that on May 14, 2019, I electronically filed the foregoing with the

4  Clerk of the Court using the CM/ECF system which will send notification of such filing to

5  the attorney(s) of record for the defendant(s).

6

7                                    s/ *Catherine L. Crisham*
                                     CATHERINE L. CRISHAM
8                                    Assistant United States Attorney
                                     United States Attorney's Office
9                                    700 Stewart Street, Suite 5220
                                     Seattle, Washington 98101-1271
10                                   Telephone:    (206) 553-7970
                                     Fax:          (206) 553-0755
11                                   E-mail:       Catherine.crisham@usdoj.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S SENTENCING MEMORANDUM - 23
*United States v. Taylor*, CR16-300 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970